No. 25-60487 consolidated with No. 26-60051

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

MATTERHORN EXPRESS PIPELINE, L.L.C.,

*Petitioner,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petition for Review from the
Federal Energy Regulatory Commission

# OPENING BRIEF FOR PETITIONER MATTERHORN EXPRESS PIPELINE, L.L.C.

Z.W. Julius Chen
Emily P. Mallen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER
& FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
chenj@akingump.com

*Counsel for Petitioner Matterhorn Express Pipeline, L.L.C.*

## CERTIFICATE OF INTERESTED PERSONS

Nos. 25-60487 & 26-60051*, Matterhorn Express Pipeline, L.L.C. v. FERC*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioner**
Matterhorn Express Pipeline, L.L.C.

**Counsel for Petitioner**
Z.W. Julius Chen
Emily P. Mallen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP

**Respondent**
Federal Energy Regulatory Commission

**Counsel for Respondent**
Samuel G. Backfield
Robert H. Solomon

*/s/Z.W. Julius Chen*
Z.W. Julius Chen

*Counsel for Petitioner Matterhorn Express Pipeline, L.L.C.*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Matterhorn Express Pipeline, L.L.C. respectfully requests oral argument. These consolidated appeals raise important issues, including the propriety of the Federal Energy Regulatory Commission's sudden departure from established practice, as well as the proper interpretation and application of the Commission's regulations governing intrastate pipelines. Oral argument will assist the Court in resolving those issues. *See* FED. R. APP. P. 34(a)(2).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........ i
STATEMENT REGARDING ORAL ARGUMENT ........ ii
TABLE OF AUTHORITIES ........ v
JURISDICTIONAL STATEMENT ........ 1
STATEMENT OF ISSUES PRESENTED FOR REVIEW ........ 3
INTRODUCTION ........ 4
STATEMENT OF THE CASE ........ 7
A. Legal Framework ........ 7
B. Procedural History ........ 12
SUMMARY OF ARGUMENT ........ 20
STANDARD OF REVIEW ........ 22
ARGUMENT ........ 22
I. THE COMMISSION ARBITRARILY TREATED MATTERHORN DIFFERENTLY THAN OTHER INTRASTATE PIPELINES ........ 23
A. The Commission Routinely Accepts Non-SFV And $0.000 Minimum Rates Like Matterhorn's ........ 24
B. The Commission Cannot Justify Its Disparate Treatment Of Matterhorn's Rates ........ 28
II. THE COMMISSION'S NEW RATE REQUIREMENTS CONFLICT WITH THE EXISTING REGULATORY REGIME ........ 31
A. The Commission's Regulations Do Not Permit *Ad Hoc* Imposition Of An SFV Requirement ........ 32
*1. Section (b)(1) eschews any particular rate design.* ........ 32
*2. The Commission's rebuttable presumption framework cannot be squared with its own precedents.* ........ 38

*3.* ANR Pipeline *does not permit the Commission to import inapplicable NGA requirements into Section (b)(1).* .......................... 43

B. Neither The NGPA Nor Its Implementing Regulations Supports The Imposition Of A No-$0.000 Minimum-Rate Requirement ........................... 48

III. THE COMMISSION'S PRONOUNCEMENT AND APPLICATION OF ITS NEW RATE REQUIREMENTS WAS UNLAWFUL ................................................................ 52

A. The Commission Did Not Acknowledge Its Change In Policy Or Address Reliance Interests ........ 52

B. The Commission Cannot Apply Its New Rules To Matterhorn Retroactively And Without Notice ........... 57

CONCLUSION ........................................................................... 60

CERTIFICATE OF SERVICE................................................................ 61

CERTIFICATE OF COMPLIANCE ....................................................... 62

# TABLE OF AUTHORITIES

**CASES:**

*ANR Pipeline Co. v. FERC*,
71 F.3d 897 (D.C. Cir. 1995) .................... *passim*

*Associated Gas Distribs. v. FERC*,
824 F.2d 981 (D.C. Cir. 1987) .................... 9, 43, 44
899 F.2d 1250 (D.C. Cir. 1990) .................... 8

*BP Am., Inc. v. FERC*,
52 F.4th 204 (5th Cir. 2022) .................... 8, 36

*Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*,
951 F.3d 248 (5th Cir. 2020) .................... 42

*Chem-Haulers, Inc. v. ICC*,
565 F.2d 728 (D.C. Cir. 1977) .................... 30

*Duke Energy Progress, LLC v. FERC*,
106 F.4th 1145 (D.C. Cir. 2024) .................... 30

*El Paso Elec. Co. v. FERC*,
832 F.3d 495 (5th Cir. 2016) .................... 22

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .................... 53, 57

*Etelson v. OPM*,
684 F.2d 918 (D.C. Cir. 1982) .................... 23

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................... 54

*Flight Training Int'l, Inc. v. FAA*,
58 F.4th 234 (5th Cir. 2023) .................... 34

*Gas Transmission Nw., L.L.C. v. FERC*,
157 F.4th 674 (5th Cir. 2025) .................... 22

*Gonzales-Veliz v. Barr*,
938 F.3d 219 (5th Cir. 2019) .......... 53

*Heckler v. Community Health Servs. of Crawford Cnty., Inc.*,
467 U.S. 51 (1984) .......... 57

*LeMoyne-Owen Coll. v. NLRB*,
357 F.3d 55 (D.C. Cir. 2004) .......... 31

*Lion Elastomers, LLC v. NLRB*,
108 F.4th 252 (5th Cir. 2024) .......... 57, 58, 59

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 22

*National Auto. Dealers Ass'n v. FTC*,
127 F.4th 549 (5th Cir. 2025) .......... 32

*Neumann's Pharmacy, L.L.C. v. DEA*,
167 F.4th 320 (5th Cir. 2026) .......... 32, 33

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*,
416 U.S. 267 (1974) .......... 58

*Noranda Alumina, L.L.C. v. Perez*,
841 F.3d 661 (5th Cir. 2016) .......... 23

*NRG Power Mktg., LLC v. FERC*,
862 F.3d 108 (D.C. Cir. 2017) .......... 56

*Oklahoma ex rel. Derryberry v. FERC*,
661 F.2d 832 (10th Cir. 1981) .......... 8, 9

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) .......... 34, 58

*Shenzhen IVPS Tech. Co. v. FDA*,
148 F.4th 306 (5th Cir. 2025) .......... 23

*Southern La. Area Rate Cases v. FPC*,
428 F.2d 407 (5th Cir. 1970) .......... 7

*United Gas Pipe Line Co. v. FERC*,
597 F.2d 581 (5th Cir. 1979) .......... 54

*University of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
985 F.3d 472 (5th Cir. 2021) .......... 23

*Village of Morrisville v. FERC*,
136 F.4th 1117 (D.C. Cir. 2025) .......... 22

**<u>STATUTES AND REGULATIONS</u>:**

5 U.S.C.
§ 706(2)(A) .......... 22

Natural Gas Act of 1938, 15 U.S.C.
§§ 717-717z .......... 8

Natural Gas Policy Act of 1978, 15 U.S.C.
§§ 3301-3432 .......... 9
§ 3371(a)(2)(A) .......... 9, 10
§ 3371(a)(2)(B)(i) .......... 48
§ 3371(a)(2)(B)(ii) .......... 10
§ 3416 .......... 1
§ 3416(a)(2) .......... 1
§ 3416(a)(3) .......... 1
§ 3416(a)(4) .......... 1

18 C.F.R.
§ 284.7(e) .......... 49
§ 284.10(c)(4)(ii) .......... 49
§ 284.123(a) .......... 32, 40
§ 284.123(b)(1) .......... 10, 11, 35, 37
§ 284.123(b)(1)(i)(A) .......... 35, 38
§ 284.123(b)(1)(ii) .......... *passim*
§ 284.123(b)(2) .......... 11, 47
§ 284.123(b)(2)(i) .......... 10, 33, 35, 36
§ 284.123(b)(2)(ii) .......... 12, 31
§ 284.123(b)(2)(iii) .......... 41

18 C.F.R. (cont.)
§ 284.123(d) .......... 40
§ 284.123(e) .......... 14
§ 284.123(g) .......... 55

**<u>OTHER AUTHORITIES</u>:**

*Enbridge Pipelines (N. Tex.) L.P.*, 139 FERC ¶ 61,216 .......... 34

*EPGT Tex. Pipeline, L.P.*, 99 FERC ¶ 61,295 (2002) .......... 47

*Green Canyon Pipe Line Co.*, 98 FERC ¶ 61,041 (2002) .......... 44

*GulfTerra Tex. Pipeline, L.P.*, 106 FERC ¶ 61,184 (2004) .......... 47

H.R. REP. NO. 95-543 (1977) .......... 9

Interim Regulations Implementing the Natural Gas Policy Act of 1978, 43 Fed. Reg. 56,448 (Dec. 1, 1978) .......... 10, 34

*Koch Gateway Pipeline Co.*, 77 FERC ¶ 61,085 (1996) .......... 46

*Mid Continent Mkt. Ctr., Inc. v. Panhandle E. Pipe Line Co.*, 86 FERC ¶ 61,259 (1999) .......... 46, 51

*Northern Ind. Pub. Serv. Co.*, 184 FERC ¶ 61,032 (2023) .......... 37, 38, 39, 40

*Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284*, Order No. 636, 59 FERC ¶ 61,030 (1992) .......... 16

*Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284*, Order No. 636-B, 61 FERC ¶ 61,272 (1992) .......... 44

*Phenix Transmission Co.*,
32 FERC ¶ 61,096 (1985) ........ 50

*Regency Intrastate Gas LP*,
172 FERC ¶ 61,187 (2020) ........ 47

*Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 436, FERC Stats. & Regs. Preambles ¶ 30,665 (Oct. 9, 1985) (published at 50 Fed. Reg. 42,408 (Oct. 18, 1995)) ........ 17, 18, 50, 51

*Revisions to Procedural Regulations Governing Transportation by Intrastate Pipelines*, Order No. 781, 144 FERC ¶ 61,034 (2013) ........ *passim*

Sales and Transportation of Natural Gas, 44 Fed. Reg. 52,179 (Sept. 7, 1979) ........ 11, 36

U.S. Energy Info. Admin., *In 2024, the United States Produced More Energy than Ever Before* (June 9, 2025) ........ 7

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 3416 to review the Federal Energy Regulatory Commission orders at issue here, which concern rates filed pursuant to section 311 of the Natural Gas Policy Act of 1978 by Petitioner Matterhorn Express Pipeline, L.L.C.

The Commission issued an initial order regarding Matterhorn's rates on June 2, 2025, *see* R.6 ("Initial Order"), and a non-substantive order deeming Matterhorn's timely filed rehearing petition denied by operation of law on August 4, 2025, *see* R.12 ("Denial Order"); *see also* 15 U.S.C. § 3416(a)(2). Matterhorn timely filed a petition for review of the Initial Order and the Denial Order in this Court on September 11, 2025. *See* Pet. for Review, *Matterhorn Exp. Pipeline, L.L.C. v. FERC*, No. 25-60487, Doc. No. 1-1 (5th Cir.); *see also* 15 U.S.C. § 3416(a)(4).

Prior to filing the record of the proceeding in this Court, the Commission issued a substantive order denying rehearing on December 18, 2025. *See* R.14 ("Rehearing Order"); *see also* 15 U.S.C. § 3416(a)(3). Matterhorn timely filed a second, protective petition for review in this Court on January 23, 2026, *see* Pet. for Review, *Matterhorn Exp. Pipeline, L.L.C. v. FERC*, No. 26-60051, Doc. No. 1-1 (5th Cir.); *see also* 15 U.S.C.

§ 3416(a)(4); *Evergy Kan. Cent., Inc. v. FERC*, 77 F.4th 1050, 1055 (D.C. Cir. 2023); *Vistra Corp. v. FERC*, 80 F.4th 302, 312 n.16 (D.C. Cir. 2023), which this Court consolidated with Matterhorn's initial petition for review, *see* Order Granting Mot. to Consolidate, No. 25-60487, Doc. No. 36-2.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**I.** Whether the Federal Energy Regulatory Commission acted arbitrarily and capriciously in rejecting Matterhorn Express Pipeline, L.L.C.'s state-approved rates for transporting natural gas, when the Commission has routinely accepted materially identical rates from other intrastate pipelines—including at least 50 rates currently on file.

**II.** Whether the Commission's imposition of rate requirements that conflict with its regulations and precedents under section 311 of the Natural Gas Policy Act of 1978 was arbitrary, capricious, and contrary to law.

**III.** Whether the Commission acted arbitrarily, capriciously, and contrary to law by failing to acknowledge or explain its change in policy, without addressing Matterhorn's and industry stakeholders' reliance interests or providing notice and an opportunity to be heard.

## INTRODUCTION

Since the 1970s, the Federal Energy Regulatory Commission's regulations have permitted an intrastate pipeline to participate in the interstate transportation of natural gas, using the same rate for comparable intrastate service already approved and on file with a state agency. When a pipeline elects to use its state-approved rate for both intrastate and interstate services, the Commission (in its own words) has "limited" its review to whether that rate "is for the appropriate *** transportation service comparable to the interstate service." It "does not look behind"—and in fact "defers" to—the state agency's determinations.

In this case, Petitioner Matterhorn Express Pipeline, L.L.C. secured approval of intrastate transportation rates from the Railroad Commission of Texas and elected to charge the same rates for comparable interstate service, precisely as the Commission's regulations contemplate. The Commission agreed that Matterhorn's election was proper. Yet the Commission presumptively rejected Matterhorn's rates for failure to employ a particular methodology, known as straight fixed variable ("SFV") rate design, and for setting $0.000 minimum rates. That

refusal to accept Matterhorn's Texas-approved rates violates several basic tenets of administrative law.

To begin, the Commission's rejection of Matterhorn's rates is anomalous. At least 50 intrastate pipelines currently have materially identical rates on file with the Commission that are not the product of an SFV methodology and/or set $0.000 minimums. The Commission provided no credible basis to distinguish those filings from Matterhorn's. Indeed, it admitted that the agency's historical treatment of such rates has been "not entirely consistent" and should be written off as "mistakenly accepted." Those excuses are implausible in their own right, but in all events do nothing to obscure the simple fact that the Commission has treated Matterhorn differently than others—textbook arbitrary and capricious decisionmaking.

If that were not enough, the Commission's SFV and no-$0.000 minimum-rate requirements are at odds with the regulatory scheme created by the Natural Gas Policy Act of 1978. The Commission's implementing regulations expressly require only that Matterhorn elect the same rate for comparable intrastate service already approved by the appropriate Texas agency. The Commission has also consistently

declined to second-guess such determinations by state agencies. All of that is in keeping with Congress's fundamental goal, echoed by the Commission throughout the years, to encourage intrastate pipelines to participate in interstate markets by *reducing* their regulatory burdens. The Commission cannot require Matterhorn to play by a more onerous and restrictive set of rules—imported from the separate regulatory regime that governs interstate pipelines—on the fly.

Allowing the Commission to do so, moreover, would violate the Administrative Procedure Act ("APA") in another way: an agency that changes course must recognize that it is doing so and justify its policy shift, including by addressing reliance interests. Here, the Commission clung to the notion that the rejection of Matterhorn's rates was business as usual, when all signs point to the opposite conclusion, and altered the regulatory landscape overnight and without warning. As a result, the Commission sidestepped the consequences of presumptively rejecting state-approved rates that are non-SFV and use $0.000 minimums. Under the Commission's Orders, Matterhorn would be forced to restructure (to the extent possible) its operations and contracts with natural gas shippers, which had already fully subscribed to Matterhorn's services at

Texas-approved rates no different from those the Commission has accepted for decades. Equally as alarming, industry stakeholders—including similarly situated intrastate pipelines—are left to wonder whether their rates may be in jeopardy notwithstanding state-agency approval and prior Commission deference.

In sum, the Commission has (i) engaged in disparate treatment, (ii) ignored its own regulations and precedents, and (iii) failed to address or provide notice of its departure from longstanding practice. This Court should grant Matterhorn's petitions for review, vacate the Commission's Orders, and remand for acceptance of Matterhorn's Texas-approved rates for section 311 service.

## STATEMENT OF THE CASE

### A. Legal Framework

**1.** For decades, "[n]atural gas [has been] the nation's most important, or at least most widely used, source of energy." *Southern La. Area Rate Cases v. FPC*, 428 F.2d 407, 418 (5th Cir. 1970); *see* U.S. Energy Info. Admin., *In 2024, the United States Produced More Energy than Ever Before* (June 9, 2025).[1] "[N]atural gas cannot simply be

[1] https://www.eia.gov/todayinenergy/detail.php?id=65445.

brought to market in a truck, like produce; it must be transported through pipelines." *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1253-1254 (D.C. Cir. 1990).

Congress's regulation of natural gas pipelines has long distinguished between interstate and intrastate transportation. In the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717-717z, "Congress carefully divided up regulatory power over the natural gas industry" by "grant[ing] [the Commission] jurisdiction over transactions in *interstate* natural gas but den[ying] jurisdiction over production and purely *intrastate* activity." *BP Am., Inc. v. FERC*, 52 F.4th 204, 214 (5th Cir. 2022) (emphases added). Accordingly, "[w]holly intrastate gas, i.e., gas produced, sold and consumed within a state," remained subject to state regulation alone. *Oklahoma ex rel. Derryberry v. FERC*, 661 F.2d 832, 834 (10th Cir. 1981).

"This statutory scheme, as originally enacted, eventually resulted in a fragmented natural gas market, with much gas sequestered away in disparate intrastate markets and unable to cross state lines without being subjected to NGA regulations." *BP Am.*, 52 F.4th at 214. By the late 1960s, "the price disparity between interstate and intrastate gas

increased substantially," creating "market distortions." *Oklahoma*, 661 F.2d at 834. That "prompted many producers to sell their production in the intrastate, rather than interstate market, resulting in shortages of gas in nonproducing states." *Id.*

Congress responded by passing the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. §§ 3301-3432, which "endeavored to break down the regulatory barriers" to intrastate pipelines' participation in the interstate market. *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1001 (D.C. Cir. 1987). To that end, section 311(a)(2) of the NGPA permits "any intrastate pipeline to transport natural gas on behalf of *** any interstate pipeline," 15 U.S.C. § 3371(a)(2)(A), "without subjecting intrastate pipelines, already regulated by State agencies, to [federal] regulation over the entirety of their operations," H.R. REP. NO. 95-543, at 45 (1977).

**2.** Under section 311(a)(2), an intrastate pipeline authorized by the Commission "to transport natural gas on behalf of *** any interstate pipeline" may set rates and charges that are "fair and equitable" and do not "exceed an amount which is reasonably comparable to the rates and charges which interstate pipelines would be permitted to charge for

providing similar transportation service." 15 U.S.C. § 3371(a)(2)(A), (B)(i). The statute does not define "fair and equitable" or set a rate floor. Instead, it provides that "[t]he Commission shall, by rule, establish the method for calculating an amount necessary to *** reasonably compensate" intrastate pipelines and give them "an opportunity *** to earn a reasonable profit." *Id.* § 3371(a)(2)(B)(ii).

The Commission's section 311 implementing regulations, which were promulgated within months of the NGPA's enactment, have remained largely unchanged. *See, e.g.*, Interim Regulations Implementing the Natural Gas Policy Act of 1978, 43 Fed. Reg. 56,448 (Dec. 1, 1978). Pertinent here, the regulations grant intrastate pipelines two rate-setting options for their interstate transportation of natural gas: (i) elect to use rates already approved by an appropriate state regulatory agency for comparable intrastate service, 18 C.F.R. § 284.123(b)(1); or (ii) apply to the Commission for approval of proposed rates by supplying "information showing the proposed rates and charges are fair and equitable," *id.* § 284.123(b)(2)(i). As the Commission made clear from the outset, "[t]he intent of the regulations is to set section 311(a)(2) rates by reference to tariffs applicable to other intrastate transportation; absent

such a tariff the Commission will set the rate." Sales and Transportation of Natural Gas, 44 Fed. Reg. 52,179, 52,182 (Sept. 7, 1979).

Consistent with that dichotomy, an intrastate pipeline's choice has distinct procedural consequences. When an intrastate pipeline elects to use existing state-approved rates under section 284.123(b)(1)—referred to here as "Section (b)(1)" rates—the Commission has "limited" its review "to whether the rate meets the requirements of that section." *Revisions to Procedural Regulations Governing Transportation by Intrastate Pipelines*, Order No. 781, 144 FERC ¶ 61,034, paras. 57-58 (2013). So long as "the state rate or rate methodology elected by the [intrastate] pipeline is for the appropriate *** transportation service comparable to the interstate service[,] *** [t]he Commission does not look behind the state regulatory agency's cost and revenue findings to determine whether they are reasonably supported." *Id.*, para. 58. To the contrary, "the Commission defers to the cost and revenue factual findings of the state regulatory agency," and historically has not issued orders affirmatively approving state-elected Section (b)(1) rates. *Id.*

By contrast, when an intrastate pipeline elects to "file[] a petition for rate approval under § 284.123(b)(2)"—referred to here as "Section

(b)(2)" rates—"the Commission makes its own cost and revenue findings, based on data filed by the pipeline." Order No. 781, 144 FERC ¶ 61,034, para. 58. The Commission must complete its review of any proposed Section (b)(2) rates within 150 days, unless it "extends the time for action, or institutes a proceeding in which all interested parties will be afforded an opportunity for written comments and for the oral presentation of views, data and arguments." 18 C.F.R. § 284.123(b)(2)(ii). Ultimately, "the Commission either will approve the rate or disprove the rate" proposed by the pipeline under Section (b)(2). *Id.*

### B. Procedural History

**1.** Conceived in 2022 to relieve transportation bottlenecks in the Permian Basin, Matterhorn is a 601-mile intrastate natural gas pipeline that extends from West Texas to the outskirts of Katy, near Houston. It offers firm, interruptible, authorized overrun, and park and loan services to natural gas shippers, subject to rates on file with the Railroad Commission of Texas—the state agency responsible for regulating intrastate pipelines. *See* R.6, at 1-2, ¶ 2.[2]

[2] With firm service, a shipper reserves the right to transport a specific quantity of gas on the pipeline that is not subject to a prior claim by another shipper. Interruptible service means that the capacity used

MATTERHORN EXPRESS PIPELINE OVERVIEW




R.1, at 15.

In July 2023, Matterhorn sought Texas approval that certain proposed rates for intrastate service were reasonable and not in excess of a cost-based rate. R.9, at 5. In support, Matterhorn provided the

---

to provide the service is not reserved, and instead is subject to a prior claim by another shipper.

Authorized overrun and park and loan services are two forms of interruptible service. Authorized overrun is an amount of gas in excess of the specific quantity set forth in a shipper's transportation service agreement. Park and loan is a short-term service that allows a shipper to park excess supply or borrow supply from a pipeline, and may be used by a shipper to manage its imbalances. *See generally* R.1, at 19-22.

Railroad Commission of Texas a cost-of-service study, fact and expert witness testimony, and other papers and schedules. *Id.* No protests were filed.

In January 2024, Matterhorn's rates were determined to be "fair and reasonable and not in excess of a cost-based rate." R.9, at 5 (Railroad Commission of Texas order setting out findings of facts and conclusions of law). By September 2024, Matterhorn was providing intrastate service across the entire length of its system. *See* R.6, at 1-2, ¶ 2.

**2.** Although a substantial majority of Matterhorn's service concerns the Texas intrastate market, in October 2024, Matterhorn began providing interstate service pursuant to section 311 of the NGPA and timely filed with the Commission a statement of operating conditions and petition to establish rates, effective October 1, 2024. *See* R.6, at 1-2, ¶ 2; *see also* 18 C.F.R. § 284.123(e) (requiring pipelines providing section 311 service to file statement of operating conditions and rate election within 30 days of commencing service). Matterhorn expressly elected to proceed under Section (b)(1) of the Commission's regulations, using rates "contained in one of its then effective transportation rate schedules for

intrastate service on file with [the Railroad Commission of Texas]" for "comparable" service. 18 C.F.R. § 284.123(b)(1)(ii); *see* R.1, at 1, 4-6.

The next day, the Commission issued a Notice of Filing of Matterhorn's petition, setting the public comment deadline as November 21, 2024. *See* R.2. As in the Texas proceeding, "[n]o protests or adverse comments were filed." R.6, at 3, ¶ 5.

**3.** In June 2025—more than seven months after Matterhorn commenced interstate service and made its rate election, and without any meaningful activity on the docket during that period—the Commission issued the Initial Order ostensibly accepting Matterhorn's filing but disapproving Matterhorn's proposed rates. The Commission agreed that Matterhorn met what it labeled the "procedural requirements" for using state-approved rates under Section (b)(1) because: "(1) Matterhorn's proposed section 311 rates are based upon its [Texas-approved] rates; (2) the state-approved rates were for service 'comparable' to the proposed Commission-jurisdictional service; and (3) the [Railroad Commission of Texas] was the 'appropriate state regulatory agency' to review those particular rates." R.6, at 3-4, ¶¶ 6-7. The Commission thus concluded

that Matterhorn's rates should "receive the rebuttable presumption of being fair and equitable." R.6, at 3, ¶ 6.

The Commission nevertheless rejected Matterhorn's rates for two reasons.

*First*, the Commission faulted Matterhorn for not using an SFV rate design, under which fixed costs are recovered through a "reservation" or "demand" charge and variable costs are recovered through a separate "usage" or "commodity" charge. *See* R.6, at 5-8, ¶¶ 9-12; *see also* R.6, at 4, ¶ 6 n.16 ("Under SFV, all fixed costs are classified to the demand component and all variable costs are classified to the usage component."). The Commission asserted that in "Order No. 636," it "established SFV as the uniform rate design method for all *interstate* pipelines" operating under the NGA "and ruled that 'any party (or parties) advocating for something other than SFV carries a heavy burden of persuasion.'" R.6, at 5, ¶ 9 (emphasis added) (quoting *Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284*, Order No. 636, 59 FERC ¶ 61,030 (1992)). It then read the D.C. Circuit's decision in *ANR Pipeline Co. v. FERC*, 71 F.3d 897 (D.C. Cir. 1995), to stand for the proposition that the NGA's SFV

framework must be applied to *intrastate* pipelines operating under section 311 of the NGPA. *See* R.6, at 5-6, ¶ 9.

Applying that reasoning to Matterhorn's filing, the Commission determined that Matterhorn failed to "charge a firm rate that recovers fixed costs from the demand component and variable costs from the usage component of its rates under the SFV methodology." R.6, at 7, ¶ 11. That is because the Commission considered certain of Matterhorn's expenses to be variable costs that must be recovered through the usage component of an SFV rate. *See id.* But the Texas-approved rate Matterhorn had elected under Section (b)(1) was a blended "one-part firm rate that recovers all of its costs, including both its fixed and variable costs," without attributing them to separate demand and usage rate components. R.6, at 7-8, ¶ 12.

*Second*, the Commission claimed that Matterhorn "violated" the Commission's minimum-rate requirement by setting a minimum rate of $0.000, despite having "variable costs." R.6, at 8-9, ¶¶ 13-15. The Commission relied on "Order No. 436," which generally requires the development of a minimum rate that is no less than average variable costs. *See* R.6, at 8, ¶ 13 & n.40 (citing *Regulation of Natural Gas*

*Pipelines After Partial Wellhead Decontrol*, Order No. 436, FERC Stats. & Regs. Preambles ¶ 30,665 (Oct. 9, 1985) (published at 50 Fed. Reg. 42,408 (Oct. 18, 1995))). The Commission concluded that "[a] $0 minimum rate is not possible unless the evidence demonstrates that there are no variable costs"—"circumstances [that] do not exist here." R.6, at 8-9, ¶ 14.

The Commission ordered Matterhorn to file within 30 days an amended statement of rates "based upon an SFV rate design *** , effective October 1, 2024." R.6, at 10.

**4.** Matterhorn moved to stay or, in the alternative, for an extension of time to comply with the Initial Order. Matterhorn explained that it had no notice of the SFV and no-$0.000 minimum-rate requirements, and that changing its rates retroactively would require it to renegotiate its shipper contracts and expose it to potential breach-of-contract claims. *See* R.7, at 10-14. When the Commission did not act by the 30-day deadline, Matterhorn submitted a revised statement of operating conditions, under protest, and petitioned for rehearing. *See* R.8; R.9.

The Commission denied rehearing, dismissed the stay-related request as moot, and rejected Matterhorn's revised (under-protest)

compliance filing. Doubling down on the Initial Order's reasoning, the Commission asserted that its rate requirements were "grounded in both the history of the NGPA and relevant precedent." R.14, at 6, ¶ 13. That precedent consisted mainly of NGA authorities the Commission "acknowledge[d]" were applicable to interstate pipelines, but in the Commission's view "carried over to [intrastate] pipelines following the *ANR v. FERC* proceeding." R.14, at 16-18, ¶¶ 29 & n.97, 31.

In response to Matterhorn's arguments that the Commission was imposing new rules on Matterhorn that departed from past policy and practice regarding limited Commission review of Section (b)(1) rate elections, the Commission insisted that it had an obligation to independently examine state-agency-approved rates. *See* R.14, at 24-29, ¶¶ 44-49. The Commission similarly maintained that it had consistently required pipelines to comply with SFV and no-$0.000 minimum-rate rules, while also admitting that its precedent was "not entirely consistent." R.14, at 32-33, ¶ 55. According to the Commission, its acceptance of other intrastate pipelines' identically structured rates was just a series of "mistake[s]." *Id.*

## SUMMARY OF ARGUMENT

**I.** The Commission's rejection of Matterhorn's rates, on the grounds that Matterhorn was required to use an SFV rate design and set a non-$0.000 minimum rate, is arbitrary and capricious disparate treatment. Reflecting the Commission's decades-long practice, at least 50 similarly situated intrastate pipelines currently have section 311 rates on file with the Commission that are non-SFV and/or use $0.000 minimums. The Commission cannot distinguish those rates from Matterhorn's. Nor can the Commission explain away their regular acceptance as "mistake[s]."

**II.** The Commission's imposition of new rate requirements in Matterhorn's proceeding is arbitrary, capricious, and contrary to law because they depart from the existing regulatory regime.

**A.** Section (b)(1) expressly permits a pipeline to elect the same rate for section 311 interstate service that a state agency has already approved for comparable intrastate service. In addition, the Commission has emphasized that it will not "look behind," and instead will "defer[]" to, a state agency's findings. The Orders under review, however, eliminate Section (b)(1) elections for pipelines (like Matterhorn) using non-SFV rates, and force those pipelines to justify their state-approved

rates (or different rates) anew before the Commission—as though they had made a Section (b)(2) election. The Commission cannot skip notice-and-comment rulemaking and effectively amend its regulations through the Orders—least of all when the SFV requirement applies to NGA pipelines, not to section 311 NGPA pipelines.

**B.** The Commission's no-$0.000 minimum-rate rule appears nowhere in Section (b)(1) or the NGPA, in contrast to (inapplicable) NGA regulations that *do* set price floors. The Commission has also previously relied on state agencies to review minimum rates for anticompetitive concerns, and has no basis to find that Matterhorn's rates were predatory notwithstanding the Railroad Commission of Texas's approval.

**III.** Even assuming the Commission's Orders were otherwise valid, they still would be arbitrary, capricious, and contrary to law because the Commission fails to recognize that it has changed its policy on deferring to state-approved rates elected under Section (b)(1). It thus grappled with none of the consequences—not only for Matterhorn but for industry stakeholders more broadly—that follow from erecting a new regulatory regime without advance notice and a meaningful opportunity to be heard.

## STANDARD OF REVIEW

This Court reviews Commission orders under the APA to ensure that they are "not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Gas Transmission Nw., L.L.C. v. FERC*, 157 F.4th 674, 700 (5th Cir. 2025) (quoting 5 U.S.C. § 706(2)(A)). The Court reviews legal questions de novo. *See Village of Morrisville v. FERC*, 136 F.4th 1117, 1125 (D.C. Cir. 2025); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 & n.4 (2024). Although the Court generally defers to the Commission's policy decisions, "that deference only applies when [the Commission] has 'articulate[d] a satisfactory explanation for its action.'" *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 503 n.8 (5th Cir. 2016) (second alteration in original).

## ARGUMENT

The Commission's rejection of Matterhorn's Texas-approved rates, because they are not the product of an SFV rate design and include $0.000 minimums, is: (i) irreconcilable with the Commission's routine acceptance of such rates, in deference to Texas's and other states' regulatory agencies; (ii) contrary to the text and structure of the Commission's NGPA regulations and precedents; and (iii) otherwise

arbitrary, capricious, and contrary to law, given the Commission's failure to recognize or provide advance notice of its sharp departure from longstanding practice, which has engendered considerable reliance interests.

## I. THE COMMISSION ARBITRARILY TREATED MATTERHORN DIFFERENTLY THAN OTHER INTRASTATE PIPELINES

"It is a bedrock principle of administrative law that an agency must treat like cases alike." *University of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 479 (5th Cir. 2021) (internal quotation marks omitted). That is because "[g]overnment is at its most arbitrary when it treats similarly situated people differently." *Etelson v. OPM*, 684 F.2d 918, 926 (D.C. Cir. 1982). Thus, "[a]n agency must provide an adequate explanation to justify treating similarly situated parties differently. If the agency fails to do so, its action is arbitrary and capricious and cannot be upheld." *Shenzhen IVPS Tech. Co. v. FDA*, 148 F.4th 306, 317 (5th Cir. 2025) (citation and internal quotation marks omitted); *see Noranda Alumina, L.L.C. v. Perez*, 841 F.3d 661, 665 (5th Cir. 2016) ("[A]dministrative agencies must apply the same basic rules to all similarly situated supplicants."). In this case, there can be no question

that the Commission disparately and arbitrarily rejected Matterhorn's Texas-approved rates.

### A. The Commission Routinely Accepts Non-SFV And $0.000 Minimum Rates Like Matterhorn's

According to the Commission, "Matterhorn fail[ed] to *** use Straight Fixed Variable (SFV) rate design" and "impermissibly set[] a minimum rate of zero despite *** having variable costs." R.6, at 3-4, ¶ 6. In defense of those determinations, the Commission invokes a "longstanding policy" that "[r]ate designs that depart from SFV without justification are not 'fair and equitable' under [the] NGPA." *Id.*; *see* R.14, at 35-36, ¶ 60 ("[T]he use of the SFV methodology is a longstanding Commission policy[.]"). It also cites a "policy of requiring pipelines to post a minimum rate." R.14, at 17, ¶ 30; *see* R.6, at 8, ¶ 13. And it proclaims that it will not "turn a blind eye to Matterhorn's" rate structure. R.14, at 25-26, ¶ 45.

In actuality, however, the Commission has not applied its SFV and no-$0.000 minimum-rate rules to other section 311 intrastate pipelines, much less in a way that would even begin to approach a "policy." Since issuing Order No. 636 in 1992, FERC has regularly permitted non-SFV and $0.000 rates to take effect. Indeed, at least 50 intrastate pipelines

currently have such rates on file with the Commission—some of which have been operative for over a decade.[3]

---

[3] *See, e.g.*, Enable Oklahoma Intrastate Transmission LLC, Dkt. No. PR25-40 (conditionally effective Apr. 1, 2026); Northwest Natural Gas Co., Dkt. No. PR26-21 (effective Jan. 6, 2026); Atmos Energy Kentucky/Midstates Division (Tennessee), Dkt. No. PR25-58 (effective June 16, 2025); Black Hills Wyoming Gas, LLC, Dkt. No. PR25-56 (effective June 1, 2025); Southwest Gas Corp., Dkt. No. PR25-44 (effective Mar. 26, 2025); Bay Gas Storage Co., LLC, Dkt. No. PR25-41 (effective Mar. 1, 2025); Valley Crossing Pipeline LLC, Dkt. No. PR25-1 (effective Dec. 1, 2024); DTE Gas Co., Dkt. No. PR25-18 (effective Nov. 1, 2024); Kansas Gas Service, Dkt. No. PR25-10 (effective Nov. 1, 2024); KeySpan Gas East Corp., Dkt. No. PR24-93 (effective Nov. 1, 2024); ONEOK WesTex Transmission, L.L.C., Dkt. No. PR24-95 (effective Nov. 1, 2024); The Brooklyn Union Gas Co., Dkt. No. PR24-94 (effective Nov. 1, 2024); Black Hills Energy Arkansas, Dkt. No. PR25-16 (effective Oct. 14, 2024); DCP Raptor Pipeline, Dkt. No. PR24-96 (effective Sept. 1, 2024); ONEOK Gas Transportation, L.L.C., Dkt. No. PR24-90 (effective Sept. 1, 2024); EnLink LIG, Dkt. No. PR24-82 (effective Aug. 1, 2024); TC Louisiana Intrastate Pipeline, Dkt. No. PR24-68 (effective May 1, 2024); Delaware Link Ventures, LLC, Dkt. No. PR24-62 (effective Apr. 1, 2024); Aethon United Pipeline, Dkt. No. PR24-52 (effective Mar. 1, 2024); BBT Mississippi, LLC, Dkt. No. PR24-50 (effective Feb. 1, 2024); Boston Gas Co., Dkt. No. PR24-18 (effective Jan. 1, 2024); Duke Energy Ohio, Dkt. No. PR24-7 (effective Nov. 1, 2023); Northern Illinois Gas Co., Dkt. No. PR24-3 (effective Nov. 1, 2023); The People's Gas Light & Coke Co., Dkt. No. PR24-4 (effective Nov. 1, 2023); UGI Utilities, Inc., Dkt. No. PR24-5 (effective Nov. 1, 2023); The Narragansett Electric Co., Dkt. No. PR23-56 (effective June 16, 2023); ONEOK Field Services Company, L.L.C., Dkt. No. PR23-58 (effective June 1, 2023); Permian Highway Pipeline LLC, Dkt. No. PR24-24 (effective Apr. 1, 2023); Energy Transfer Fuel LP, Dkt. No. PR23-46 (effective Mar. 26, 2023); B&W Pipeline, Dkt. No. PR23-31 (effective Feb. 1, 2023); ET SCOOP Express LLC, Dkt. No. PR23-22 (effective Dec. 15, 2022); Comanche Trail Pipeline, LLC, Dkt. No. PR22-67 (effective Oct. 1, 2022); Trans-Pecos Pipeline, LLC, Dkt. No. PR22-68

Many of those section 311 filings set "Firm Transportation Service" rates that do not distinguish between reservation and usage components, making them blended or one-part rates like Matterhorn's.[4] By definition, such rates cannot be SFV. *See* R.6, at 7, ¶ 12 ("Matterhorn proposes a one-part firm rate that recovers all of its costs, including both its fixed and variable costs. Therefore, we find that Matterhorn's proposed initial

---

(effective Oct. 1, 2022); BBT Bamagas Intrastate, LLC, Dkt. No. PR22-70 (effective Sept. 27, 2022); Duke Energy Kentucky, Dkt. No. PR22-37 (effective May 2, 2022); Targa SouthTex Mustang Transmission Ltd., Dkt. No. PR22-45 (effective Apr. 21, 2022); Eagle Ford Midstream LLC, Dkt. No. PR22-5 (effective Nov. 12, 2021); Kinder Morgan Border Pipeline LLC, Dkt. No. PR22-7 (effective Nov. 1, 2021); Whistler Pipeline LLC, Dkt. No. PR21-61 (effective Aug. 1, 2021); Houston Pipe Line Co. LP, Dkt. No. PR21-16 (effective Jan. 1, 2021); Red Bluff Express Pipeline, LLC, Dkt. No. PR21-20 (effective Jan. 1, 2021); AMP Intrastate Pipeline, LLC, Dkt. No. PR20-46 (effective Feb. 24, 2020); Altus Midstream Pipeline LP, Dkt. No. PR19-41 (effective Feb. 14, 2019); Oasis Pipeline, LP, Dkt. No. PR19-37 (effective Jan. 1, 2019); Agua Blanca, LLC, Dkt. No. PR18-81 (effective July 1, 2018); ONEOK Texas Gas Storage, L.L.C., Dkt. No. PR18-37 (effective Mar. 14, 2018); Atmos Energy Colorado/Kansas Division, Dkt. No. PR17-24 (effective Mar. 1, 2017); Orange and Rockland Utilities, Inc., Dkt. No. PR16-74 (effective Aug. 31, 2016); Enterprise Intrastate LLC, Dkt. No. PR16-23 (effective Apr. 1, 2016); Peoples TWP LLC, Dkt. No. PR14-18 (effective Jan. 31, 2014).

[4] *See, e.g.*, Enable Oklahoma Intrastate Transmission, LLC, Dkt. No. PR25-40 (conditionally effective Apr. 1, 2026); UGI Utilities, Inc., Dkt. No. PR24-5 (effective Nov. 1, 2023); Eagle Ford Midstream LLC, Dkt. No. PR22-5 (effective Nov. 12, 2021); AMP Intrastate Pipeline, LLC, Dkt. No. PR20-46 (effective Feb. 24, 2020); Orange and Rockland Utilities, Inc., Dkt. No. PR16-74 (effective Aug. 31, 2016).

rates do not follow SFV methodology."); R.14, at 25, ¶ 44 ("[A] blended rate *** [is] inconsistent with Commission policy."); R.14, at 37, ¶ 64 ("Matterhorn *** proposes a one-part volumetric rate that does not separate out the demand and usage components as required by the SFV methodology in its minimum and maximum firm rates.").

In addition, several of the section 311 filings contain "Firm Transportation Service" rates that employ a $0.000 minimum, which necessarily applies to both reservation and usage components (because the rates are blended or one-part).[5] Those and other filings also set $0.000 minimums for "Interruptible Transportation Service," "Authorized Overrun Service," and "Park and Loan Service" rates—all of which are usage rates.[6] Yet those are the same types of rates for which

---

[5] *See, e.g.*, Delaware Link Ventures LLC, Dkt. No. PR24-62 (effective Apr. 1, 2024); BBT Alabama, LLC, Dkt. No. PR23-70 (effective Sept. 1, 2023); Comanche Trail Pipeline, Dkt. Nor. PR22-67 (effective Oct. 1, 2022); Whistler Pipeline LLC, Dkt. No. PR21-61 (effective Aug. 1, 2021).

[6] *See, e.g.*, EnLink LIG, Dkt. No. PR24-82 (effective Aug. 1, 2024); DTE Gas Co., Dkt. No. PR25-18 (effective Nov. 1, 2024); Northern Illinois Gas Co., Dkt. No. PR24-3 (effective Nov. 1, 2023); Red Bluff Express Pipeline, LLC, Dkt. No. PR21-20 (effective Jan. 1, 2021); Agua Blanca, LLC, Dkt No. PR18-81 (effective July 1, 2018); *see also* note 2, *supra*. Interruptible shippers generally pay a one-part, volumetric usage charge, meaning they pay only when they actually transport gas.

Matterhorn set a $0.000 minimum. *See* R.6, at 4, ¶ 6 ("[W]e cannot accept Matterhorn's proposed initial rates for firm, interruptible, authorized overrun, and park and loan services.").

In view of those materially indistinguishable section 311 rates, the Commission's disparate treatment of Matterhorn's rates is the picture of arbitrariness. The Orders should be vacated on that ground alone.

### B. The Commission Cannot Justify Its Disparate Treatment Of Matterhorn's Rates

The Commission's explanations for reconciling its anomalous treatment of Matterhorn lack merit.

Turning first to substance, the Commission suggests that Matterhorn "misunderst[ood] *** the mechanisms of SFV and minimum rates," because "blended rates were permitted" prior to the issuance of various Commission orders in the 1980s. R.14, at 31, ¶ 54. But that is a *non sequitur*. Matterhorn's examples of similarly situated intrastate pipelines concern rates that are from the past decade or so (not the past century) and are *currently* on file. Those rates are subject to the same authorities that, in the Commission's view, preclude Matterhorn's rates here.

The Commission is similarly off base in characterizing Matterhorn's examples as setting only a "minimum *demand* charge" to recoup *fixed* costs that may be discounted to $0.000. R.14, at 32, ¶ 54. The charges that Matterhorn highlighted for comparison are either: (i) blended or one-part rates that cover both fixed and variable costs, which SFV methodology would separate into demand and usage components; or (ii) usage rates that recoup variable costs. *See* R.9, at 26-27; pp. 24-28, *supra*. As in Matterhorn's case, none of those rates may be discounted to $0.000 under the Commission's Orders if a pipeline is recouping variable costs. Accordingly, the examples do the opposite of "demonstrat[ing] that these pipelines are properly applying SFV concepts." R.14, at 32, ¶ 54.

If there were any doubt that Matterhorn's examples are on all fours with the rates at issue here, it is dispelled by the Commission's attempt to brush them off as "mistakenly accepted." R.14, at 32-33, ¶ 55. That explanation blinks reality. It would be one thing if the Commission approved rates like Matterhorn's only once or twice before, but otherwise repeatedly rejected them. Indeed, that is what occurred in the cases the Commission cites in support of its "mistake" rationale: the challenged agency decision differed from only a few "wrongly decided" cases, but

otherwise aligned with the bulk of the agency's prior precedent. R.14, at 32-33, ¶ 55 nn.202-203; *see, e.g.*, *Duke Energy Progress, LLC v. FERC*, 106 F.4th 1145, 1156 (D.C. Cir. 2024) (admitting "*some* of its prior cases were wrongly decided") (emphasis added); *Chem-Haulers, Inc. v. ICC*, 565 F.2d 728, 730 (D.C. Cir. 1977) (explaining that agency error "*on one occasion* does not entitle a litigant to a repetition of [the] blunder") (emphasis added).

Here, by contrast, the Commission's 50-or-so current "mistakes"—not to mention countless others in decades past—go well beyond isolated errors. Although the Commission downplays its "precedent" as "not entirely consistent," that is no answer to the critical mass of undisturbed non-SFV and $0.000-minimum rates that make the Commission's actions here arbitrary and capricious. Notably, while many of the comparable filings concern state-approved rates elected pursuant to Section (b)(1),[7] others were the product of a Section (b)(2) proceeding.[8] That means the

[7] *See, e.g.*, Boston Gas Company, Dkt. No. PR24-18 (effective Jan. 1, 2024); Delaware Link Ventures LLC, Dkt. No. PR24-62 (effective Apr. 1, 2024); Kinder Morgan Border Pipeline LLC, Dkt No. PR22-7 (effective Nov. 1, 2021); AMP Intrastate Pipeline, LLC, Dkt. No. PR20-46 (effective Feb. 24, 2020).

[8] *See, e.g.*, DCP Raptor Pipeline, Dkt. No. PR24-96 (effective Sept. 1, 2024); ONEOK Field Services Company, L.L.C., Dkt. No. PR23-58

Commission conducted a first-level review of the pipeline's proposal, without deferring to the state agency, and affirmatively "approve[d] the rate[s]." 18 C.F.R. § 284.123(b)(2)(ii).

In the face of that track record, allowing the Commission to claim a "mistake" would effectively provide a blank check for unlawful discrimination. The Commission would never need to provide a rational explanation for treating one regulated entity differently from dozens of other similarly situated entities. Such "a cloak for agency whim" cannot be squared with the APA's bar on arbitrary and capricious agency decisionmaking. *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004).

## II. THE COMMISSION'S NEW RATE REQUIREMENTS CONFLICT WITH THE EXISTING REGULATORY REGIME

Separate and apart from the Commission's discriminatory treatment of Matterhorn, the Orders should be set aside because the SFV and no-$0.000 minimum-rate requirements conflict with the NGPA regulatory regime governing Section (b)(1) rate elections. "It is a given of administrative law that agencies must follow their own regulations."

---

(effective June 1, 2023); BBT Bamagas Intrastate, LLC, Dkt. No. PR22-70 (effective Sept. 27, 2022).

*National Auto. Dealers Ass'n v. FTC*, 127 F.4th 549, 553 (5th Cir. 2025); *see Neumann's Pharmacy, L.L.C. v. DEA*, 167 F.4th 320, 327 n.21 (5th Cir. 2026) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."). The Commission failed to do that here.

### A. The Commission's Regulations Do Not Permit *Ad Hoc* Imposition Of An SFV Requirement

#### *1. Section (b)(1) eschews any particular rate design.*

The Commission's position that a non-SFV rate presumptively fails to satisfy the "fair and equitable" standard set forth in section 311 of the NGPA cannot be reconciled with either the text or structure of the implementing regulations. In those regulations, the Commission states at the start that "[r]ates and charges for transportation of natural gas" under section 311 "*shall be fair and equitable* as determined in accordance with paragraph (b) of *** section [284.123]." 18 C.F.R. § 284.123(a) (emphasis added). Paragraph (b), in turn, presents intrastate pipelines with two options. "[A]n intrastate pipeline may elect to *** use the rates contained in one of its then effective transportation rate schedules for intrastate service on file with the appropriate state regulatory agency which the intrastate pipeline determines covers

service comparable to [interstate] service under [the NGPA]." *Id.* § 284.123(b)(1)(ii). "If an intrastate pipeline does not choose to make any election under [Section] (b)(1)," however, then "it shall apply for Commission approval, by order, of the proposed rates and charges." *Id.* § 284.123(b)(2)(i).

By its terms, Section (b)(1) does not specify any particular rate methodology. On the contrary, it directs the pipeline "[t]o use the rate[]"—without qualification—"contained in one of its then effective transportation rate schedules for intrastate service on file with the appropriate state regulatory agency" for comparable service. 18 C.F.R. § 284.123(b)(1)(ii). No textual hook exists for the Commission's proviso that such rates must be SFV. That plain-text fact forecloses the Commission's action here, as "even the most urgent regulatory goals do not permit an agency to depart from the regulations it has adopted while claiming to enforce them." *Neumann's Pharmacy*, 167 F.4th at 335. Simply put, "the [Commission] may [not] pursue stricter standards *** by misreading the regulations that govern this case." *Id.*

Nor may the Commission use Matterhorn's Section (b)(1) filing to change its regulations. The APA "mandate[s] that agencies use the same

procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). Here, the Commission promulgated Section (b)(1) through notice-and-comment rulemaking, *see, e.g.*, 43 Fed. Reg. 56,448, so it is forbidden from "effectively amend[ing]" that provision without "pass[ing] through notice and comment" once again. *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 241-242 (5th Cir. 2023).

But an effective amendment is exactly what the Commission has foisted upon Matterhorn in reading an unstated SFV limitation into Section (b)(1). Any pipeline that did not use SFV when seeking approval of its intrastate rate from a state agency would effectively be barred from proceeding under Section (b)(1). That is because, as the Commission's Rehearing Order explains, a pipeline cannot elect a Section (b)(1) rate that differs from the one on file with the state agency. *See* R.14, at 28-29, ¶ 48; *see, e.g.*, *Enbridge Pipelines (N. Tex.) L.P.*, 139 FERC ¶ 61,216, para. 13 (2012) ("EPNT's current rates are *** not 'contained in one of its then effective transportation rate schedules' on file with the [state agency], so it is not currently eligible for a section 284.123(b)(1)(ii) election.") (footnote omitted). In that circumstance, the Commission

considers the pipeline to be "proposing a Section (b)(2) rate." R.14, at 28, ¶ 48.[9]

It makes a hash of the regulation to read Section (b)(1) as a distinct pathway for rate election that leverages the work of state agencies for comparable service, only to funnel all non-SFV rates into Section (b)(2)-type proceedings. After all, the regulation on its face grants intrastate pipelines a choice to "elect" whether to proceed under Section (b)(1) or Section (b)(2). 18 C.F.R. § 284.123(b)(1). And while the Commission contends that "[t]here is no rate hierarchy," R.14, at 33, ¶ 56, Section (b)(2) is phrased conditionally: "*If* an intrastate pipeline does not choose to make any election under [Section] (b)(1)[.]" 18 C.F.R. § 284.123(b)(2)(i) (emphasis added). Where a pipeline *does* make a Section (b)(1) election,

[9] The Commission goes on to point out that in *Enbridge*, it permitted the pipeline to make a "minor deviation from the rate approved by the state authority as a section (b)(1) rate." R.14, at 29, ¶ 48. There, however, the pipeline had elected a "city-gate" rate, for which Section (b)(1) only requires an alignment of "methodology." 18 C.F.R. § 284.123(b)(1)(i)(A) (requiring pipeline to "[b]ase its rates upon the *methodology* used *** [i]n designing rates *** included in one of its then effective firm sales rate schedules for city-gate service on file with the appropriate state regulatory agency") (emphasis added). Matterhorn's election is under a different subparagraph, which requires use of the same "rates" on file with the state agency without reference to methodology. *Id.* § 284.123(b)(1)(ii).

it is not required to "apply for Commission approval, by order, of the proposed rates and charges." *Id.*; *see* 44 Fed. Reg. at 52,182 ("The intent of the regulations is to set section 311(a)(2) rates by reference to tariffs applicable to other intrastate transportation; absent such a tariff the Commission will set the rate.").

Nevertheless, for Matterhorn and other similarly situated intrastate pipelines that do not use SFV going forward, the upshot is that they cannot use their state-approved rates under Section (b)(1). They have no choice but to seek the kind of Commission approval that Section (b)(2) contemplates. That is no "elect[ion]" at all.

Beyond the lack of any textual basis for such a result, the Commission's gloss is completely at odds with its (and Congress's) goal of "reduc[ing] *** regulatory burdens on intrastate pipelines." Order No. 781, 144 FERC ¶ 61,034, para. 1; *see BP Am.*, 52 F.4th at 214. In the section 311 context, the Commission has chosen to realize that goal through a "policy of permitting intrastate pipelines to base their [interstate] rates on cost-based [intrastate] rates approved by their state regulatory agency" under Section (b)(1), Order No. 781, 144 FERC ¶ 61,034, para. 57, not by requiring them to seek independent

Commission approval of rates under Section (b)(2) that have already been vetted by state agencies—or worse still, seek Section (b)(2) approval of different interstate rates altogether for comparable intrastate service.

By the same token, the Commission is on record that "[w]hen an intrastate pipeline elects to use a state-approved rate, the Commission's examination of these § 284.123(b)(1) rate elections is limited to whether the rate meets the requirements of that section." Order No. 781, 144 FERC ¶ 61,034, para. 57. Rather than duplicate and "look behind the state regulatory agency's" findings, the Commission "focuses on whether the state rate or rate methodology elected by the pipeline is for the appropriate *** transportation service comparable to the interstate service[] to be provided by the interstate pipeline." *Id.*, para. 58. In a word, the Commission "defers" to the state agency once the basic regulatory prerequisites are met. *Id.*

The Commission's recent order in *Northern Indiana Public Service Co.*, 184 FERC ¶ 61,032 (2023), is instructive. Tracking the language of Order No. 781, the Commission explained:

> Our review of NIPSCO's rate is limited to whether: (1) NIPSCO's [interstate] rates are indeed based upon rates reviewed by the Indiana Commission; (2) the state-approved rate was for service 'comparable' to the proposed Commission-

> jurisdictional service; and (3) the Indiana Commission was indeed the 'appropriate state regulatory agency' to review those particular rates.

*Id.*, para. 8 (footnotes omitted). Finding those three requirements to be satisfied, the Commission "[a]ccordingly" approved NIPSCO's rates as "fair and equitable"—as the regulations state it "*must*" do. *Id.*

Conspicuously, the Commission did not delve into the *methodologies* employed in the state proceeding or otherwise suggest any SFV-based litmus test for proceeding under Section (b)(1) as opposed to Section (b)(2). Nor did the Commission contemplate a further independent review under Section (b)(1). Its position, fully applicable to Matterhorn, was straightforward: "NIPSCO['s] propos[al] *** to use the exact same rate components [for interstate service] as it does for the rates that the Indiana Commission developed" was "permissible under section 284.123(b)(1)(i)(A) of our regulations." 184 FERC ¶ 61,032, para. 11.

*2. The Commission's rebuttable presumption framework cannot be squared with its own precedents.*

In its Orders, the Commission agrees that "(1) Matterhorn's proposed section 311 rates are based upon its [Texas-approved] rates; (2) the state-approved rates were for service 'comparable' to the proposed Commission-jurisdictional service; and (3) the [Railroad Commission of

Texas] was the 'appropriate state regulatory agency' to review those particular rates." R.6, at 4-5, ¶ 7 (quoting 18 C.F.R § 284.123(b)(1)(ii)). Instead of accepting Matterhorn's rates, however, the Commission reasons that the satisfaction of those prerequisites merely gave rise to a "rebuttable presumption" that "does not end [the] substantive enquiry." R.6, at 4-5, ¶¶ 7-8. In its view, "[i]f evidence exists that rebuts the presumption granted under section 284.123(d)(1) that the rates are fair and equitable, the Commission may issue an order to reconsider the proposed rates and the presumption granted to such rates." R.6, at 5, ¶ 8. That reasoning fails on several levels.

For starters, even assuming the Section (b)(1) presumption is rebuttable, that has not been the Commission's approach to date. As explained, the Commission has a stated policy of "defer[ring]" to the state agency without a "look behind." Order No. 781, 144 FERC ¶ 61,034, para. 58. When applying that policy, the Commission "*must* presume" a Section (b)(1) rate "to be fair and equitable" if its "limited" review shows that the elected rate is on file with an appropriate state agency for comparable service. *Northern Ind.*, 184 FERC ¶ 61,032, para. 8. That analysis determines whether such a rate is "fair and equitable," *id.*, not

merely whether the pipeline is "eligible to recover a rate pursuant to Section (b)(1)" in the first instance, *contra* R.14, at 25-26, ¶ 45 n.158. Otherwise, the Commission in *Northern Indiana* would have conducted a separate "fair and equitable" analysis.[10]

In any event, regardless of whether presumptions are rebuttable in general, such a framework is difficult to apply to Section (b)(1) elections. Section 284.123(a) itself states, in no uncertain terms, that the proposed rate "shall be fair and equitable," so long as it is "determined in accordance with paragraph (b)." 18 C.F.R. § 284.123(a). Of course, Section (b)(1) requires only that the elected rate is on file with an appropriate state agency for comparable service. *Id.* § 284.123(b)(1)(ii).

To be sure, section 284.123(d) provides that a Section (b)(1) election is "presumed to be *** [f]air and equitable" and "[n]ot in excess of the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service." 18 C.F.R.

[10] The Commission asserts that it "did not look behind [the Texas agency's] cost and revenue findings" in this case because "a facial review of Matterhorn's filings made it clear that it was no longer eligible for the rebuttable presumption." R.14, at 25-26, ¶ 45 & n.158. That is simply semantics. The point remains that the Commission refused to accept the Texas-approved rate.

§ 284.123(d). But nothing in that provision invites rebuttal. Nor does anything else in Section (b)(1), in contrast to the provisions for instituting a rate proceeding under Section (b)(2). That is unsurprising, given that a Section (b)(1) election is possible only after a pipeline has secured approval of its intrastate rate from a state agency. Presumably, any evidence that the rate is not fair and equitable would have been aired and considered there.

Tellingly, the Commission itself does not rely on section 284.123(d)'s language to support its rebuttal presumption framework. Instead, the Commission cites its Section (b)(2) authority to "issue an order to reconsider the proposed rates and the presumption granted to such rates." R.6, at 5, ¶ 8; *see* 18 C.F.R. § 284.123(b)(2)(iii) ("A Commission order approving or disapproving a transportation rate under [Section (b)(2)] supersedes a rate determined in accordance with [Section] (b)(1)."). That authority cannot be read so expansively. It would effectively mean that any Section (b)(1) election is ultimately subject to the strictures of Section (b)(2), rendering the Section (b)(1) election essentially meaningless. Pipelines would have no reason to proceed under Section (b)(1) if the only advantage is a rebuttable presumption

that needs to be defended (preemptively) under Section (b)(2) anyway, lest the Commission decide to supersede it. *See, e.g.*, *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 264 (5th Cir. 2020) (reiterating that "courts strive to avoid" interpretation of one provision that would "render other provisions *** meaningless").

That is particularly true if, as the Commission's Orders decree, the election of a non-SFV, state-approved rate automatically fails the "fair and equitable" standard. *See* R.6, at 3-4, ¶ 6 ("Rate designs that depart from SFV without justification are not 'fair and equitable[.]'"); R.14, at 24-25, ¶ 44 ("[F]ailure to use the SFV methodology results in rates that are not 'fair and equitable.'"). To be clear: the Commission does not provide a shred of other "evidence" here for rebutting the Section (b)(1) presumption. Indeed, there were no protests in Matterhorn's docket that challenged the rate. *See* R.6, at 3, ¶ 5. The lack of SFV rate design, standing alone, was deemed sufficient.

Consequently, in *every* instance where non-SFV rates are elected under Section (b)(1)—including the filings discussed above (pp. 24-28, *supra*)—the election would be a pointless exercise. The pipeline will

always find itself stripped of the benefit of the state agency's approval and forced to "justify[] the departure" from SFV. R.6, at 3-4, ¶ 6; *see* R.14, at 25, ¶ 44 ("Matterhorn's proposed rates qualified for the rebuttable presumption that the rates are fair and equitable, that presumption was rebutted, and the burden of proof shifted back to Matterhorn to support its proposed rates."). In effect, any such rate is presumptively disapproved, flipping Section (b)(1)'s deferential construct on its head.

#### *3.* ANR Pipeline *does not permit the Commission to import inapplicable NGA requirements into Section (b)(1).*

The Commission's remaining rationales for requiring SFV for Section (b)(1) elections inappropriately subject NGPA pipelines to various provisions of the NGA and its implementing regulations. That is precisely the result Congress sought to avoid.

As the D.C. Circuit has explained: "In § 311 Congress gave [the Commission] broad authority to prescribe terms of transportation thereunder; it surely did not contemplate that [the Commission] would use this authority to duplicate the regulatory scheme in place under the NGA[.]" *Associated Gas Distribs.*, 824 F.2d at 1039. "Congress underscored this distinction in NGPA § 601(a)(2), providing that transportation in interstate commerce under § 311 shall not trigger the

Commission's NGA jurisdiction. This seems an unequivocal expression of intent that NGPA regulation should not replicate the burdens of the NGA." *Id.* at 1040.

The Commission has previously embraced Congress's directive, citing *Associated Gas Distributors* for the proposition that "nothing in the NGPA requires the Commission to adopt procedures similar to those in the NGA for purposes of determining rates for NGPA section 311 transportation service." *Green Canyon Pipe Line Co.*, 98 FERC ¶ 61,041, 61,122 (2002). Similarly, with respect to SFV specifically, the Commission long ago determined that Order No. 636, which adopted SFV for NGA pipelines, "does not apply to intrastate pipelines." *Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284*, Order No. 636-B, 61 FERC ¶ 61,272, 61,992 n.26 (1992); *accord* R.14, at 17, ¶ 31 ("We acknowledge that Order No. 636 largely exempted intrastate pipelines from the Commission's requirements."). Yet here, the Commission repeatedly roots its position that only SFV rates can be "fair and equitable" for NGPA purposes in the NGA. *See, e.g.*, R.14, at 18, ¶ 31 ("[T]he Commission's policy requiring use of the SFV methodology for

interstate pipelines also applies to intrastate pipelines that provide NGPA section 311 service.”); R.14, at 18, ¶ 32 (“[T]he SFV methodology must be equally applied to both NGA and NGPA pipelines.”).

The D.C. Circuit’s decision in *ANR Pipeline*, 71 F.3d 897, does not provide the Commission license to backdoor the NGA’s SFV requirement into section 311 of the NGPA. In *ANR Pipeline*, the D.C. Circuit considered whether the Commission had adequately explained whether a particular intrastate pipeline (“MichCon”) could elect a state-approved blended rate under Section (b)(1), in the wake of the Commission’s recent conclusion in Order No. 636 that blended rates were anticompetitive in the interstate market. *Id.* at 899-900. The Commission had permitted MichCon to use a blended rate, while requiring an NGA pipeline (“ANR”) providing competing interstate service to use an SFV rate. *Id.* ANR thus opposed MichCon’s rate election, citing a “competitive disadvantage.” *Id.*

The court granted ANR’s petition for review. In doing so, however, the court cautioned that the “change” brought about by Order No. 636 for the regulation of interstate pipelines under the NGA, as well as “the determinations underlying it, may or may not require [the Commission] to reexamine some of the assumptions under which it has dealt with

intrastate *** pipelines." 71 F.3d at 902. As such, the court stopped short of disturbing the Commission's Section (b)(1) election framework or categorically requiring SFV for all NGPA section 311 rates. Instead, the court found it "[s]uffice[d] to say that, in addressing ANR's concerns about MichCon's use of blended rates, [the Commission] must provide a reasonable justification for excluding MichCon from the SFV requirements." *Id.*; *accord Koch Gateway Pipeline Co.*, 77 FERC ¶ 61,085, 61,369 (1996) ("[T]he Court of Appeals did not reject the Commission's decision to exempt MichCon from the SFV requirement, but rather stated that the Commission must provide a reasonable justification for doing so."). Here, there is no occasion to "address[] *** concerns" over Matterhorn's Section (b)(1) election because no competitor or other party has raised any. *Id.*; *see* R.6, at 3, ¶ 5 ("No protests or adverse comments were filed.").

Although the Commission asserts that "[t]he SFV methodology has been applicable to NGPA pipelines since the *MichCon Remand Order*" arising out of *ANR Pipeline*, R.14, at 10-11, ¶ 20; *see* R.6, at 5-6, ¶ 9, none of the Commission's citations concern Section (b)(1) proceedings. In *Mid Continent Market Center, Inc. v. Panhandle East Pipe Line Co.*, 86 FERC

¶ 61,259 (1999), the Commission required a restatement of or justification for section 311 rates, as part of an NGA dispute. The other proceedings involved applications filed under Section (b)(2), which requires the pipeline to justify proposed rates to the Commission that have not been approved by a state agency. *See Regency Intrastate Gas LP*, 172 FERC ¶ 61,187 (2020); *GulfTerra Tex. Pipeline, L.P.*, 106 FERC ¶ 61,184 (2004); *EPGT Tex. Pipeline, L.P.*, 99 FERC ¶ 61,295 (2002); *see also* 18 C.F.R. § 284.123(b)(2). Where, as here, a pipeline elects a non-SFV rate under Section (b)(1) without protest, the Commission's enduring practice has been to accept the state agency's judgment and, after confirming the rate is on file with the state and for comparable service, allow it to go into effect. *See* pp. 24-28, *supra*.

At bottom, *ANR Pipeline* has never stood in the way of pipelines electing non-SFV rates under Section (b)(1). Quite the opposite, the Commission has since taken steps to distance itself from a requirement of separate justification in favor of deferential and limited review. *See, e.g.*, Order No. 781, 144 FERC ¶ 61,034, paras. 57-58; *see also* pp. 36-38, *supra*. Those actions respond to *ANR Pipeline*'s invitation "to reexamine some of the assumptions under which [the Commission] has dealt with

intrastate *** pipelines operating in interstate commerce under § 311 of the NGPA." 71 F.3d at 902. They also overtake the key predicate of the D.C. Circuit's reasoning—namely that, because "[i]n [the] decision [under review], [the Commission] *appeared* to treat th[e] presumption as rebuttable," the Commission must provide a substantive explanation for allowing a non-SFV rate. *Id.* at 902-903 (emphasis added). Given that the Commission's approach since *ANR Pipeline* has been to constrain its review in the first instance, it is entirely reasonable to conclude that a pipeline making a Section (b)(1) election need not independently justify a non-SFV rate that a state agency has already approved.

### B. Neither The NGPA Nor Its Implementing Regulations Supports The Imposition Of A No-$0.000 Minimum-Rate Requirement

The Commission's new rule that Matterhorn cannot elect a $0.000 minimum rate fares no better. Section 311 of the NGPA imposes only a rate *ceiling* on intrastate pipelines. *See* 15 U.S.C. § 3371(a)(2)(B)(i) (providing that section 311 rates "may not exceed an amount which is reasonably comparable to the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation services"). It does not require any particular rate *floor*.

Neither do the Commission's implementing regulations, which require the Commission to accept Matterhorn's rates as approved by the Railroad Commission of Texas. *See* 18 C.F.R. § 284.123(b)(1)(ii). As with SFV, the Commission cannot rewrite Section (b)(1) to impose a non-existent no-$0.000 minimum-rate requirement without going through notice-and-comment rulemaking. *See* pp. 32-36, *supra.*

The Commission nevertheless takes the position that "[i]f a pipeline incurs variable costs, the Commission's regulations require that '[a]ny minimum rate filed under this section must be based on the average variable costs which are properly allocated to the service to which the rate applies.'" R.6, at 9, ¶ 15 & n.45 (second alteration in original) (quoting 18 C.F.R. § 284.10(c)(4)(ii) and citing 18 C.F.R. § 284.7(e)). The referenced regulations, however, pertain to the NGA and expressly *exclude* intrastate pipelines from their purview. *See* 18 C.F.R. § 284.10(c)(4)(ii) (limiting scope to "[a]ny minimum rate filed under this section"); *id.* § 284.7(e) ("Except for pipelines subject to subpart C of this part, [*i.e.*, intrastate pipelines,] if a reservation fee is charged, it must recover all fixed costs attributable to the firm transportation service.").

Despite conceding that "these regulations are written for NGA pipelines," the Commission again submits that *ANR Pipeline* bridges the NGA/NGPA divide. R.6, at 9, ¶ 15 n.45. But that tack fails for all the same reasons that an SFV requirement cannot be superimposed on the Section (b)(1) election framework. Affording the same deference to state agencies as Order No. 781, the Commission has flatly "reject[ed] the notion that the NGPA requires the Commission to set a floor for intrastate rates where the pipeline itself proposes to collect less than its costs support." *Phenix Transmission Co.*, 32 FERC ¶ 61,096, 61,263 (1985). Critically, moreover, the Commission "view[ed] any possible subsidization in this situation by a pipeline's intrastate customers *as a matter for state regulatory authorities*" and indicated that it "will not impose a higher rate." *Id.* (emphasis added); *cf.* Order No. 436, 50 Fed. Reg. at 42,429 (cautioning that Commission "does not intend that any aspect of the final rule intrude in any way whatsoever on the sound discretion of the states to regulate strictly intrastate transactions in the public interest").

Although *Phenix Transmission* predates *ANR Pipeline*, as well as Order No. 436's general requirement to establish rate floors, neither

supersedes nor alters Section (b)(1)'s straightforward requirements. *Contra* R.14, at 16, ¶ 29 & n.96 (cross-referencing citation to *Mid Continent*, 86 FERC ¶ 61,259). If it were otherwise, surely the Commission would have rejected any number of the $0.000 minimum rates currently on file, never mind others throughout the past decades. *See* pp. 24-28, *supra*.

In a similar vein, the Commission contends that $0.000 minimum rates are evidence of predatory pricing that are anticompetitive. *See, e.g.*, R.14, at 17, ¶ 30. But in Order No. 436, the Commission found that "transportation by intrastate pipelines" did not present those "concerns." 50 Fed. Reg. at 42,429 ("With regard to the rate conditions of § 284.7, the proposed rule would have required intrastate pipelines to comply with the same conditions. *** In essence, there have been no real concerns with transportation by intrastate pipelines and therefore there is no need to modify the current rules."). Moreover, the Commission's blanket assertion fails to engage with the fact that no party protested Matterhorn's rates. *See* R.6, at 3, ¶ 5. It also collaterally attacks, rather than defers to, the Railroad Commission of Texas's determination that Matterhorn's $0.000 minimum rate is appropriate. Accordingly, the

Commission offers no reason to disregard the Texas agency's judgment that such a rate is appropriate here, especially considering the highly competitive nature of the Texas pipeline market. *See* R.9, at 13, 29.

## III. THE COMMISSION'S PRONOUNCEMENT AND APPLICATION OF ITS NEW RATE REQUIREMENTS WAS UNLAWFUL

Finally, even assuming the Commission's Orders neither impermissibly single out Matterhorn for special treatment nor depart from the existing section 311 regulatory structure, the manner in which the Commission imposed the SFV and no-$0.000 minimum-rate requirements on Matterhorn was arbitrary, capricious, and contrary to law.

### A. The Commission Did Not Acknowledge Its Change In Policy Or Address Reliance Interests

As explained, the Commission has consistently accepted Section (b)(1) elections of non-SFV and $0.000 minimum rates, under a regulatory scheme that defers to state agency determinations. Yet the Commission now declares that Matterhorn should be subject to different rules. The Commission may not do so for the two independent reasons set forth above—namely, arbitrary discrimination and a departure from established regulations and practice. Even setting that aside, however,

the Commission's Orders still cannot be upheld because they fail to "provide a reasoned explanation" for its change in policy. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Specifically, the Commission "must at least display awareness that it is changing position," "show that there are good reasons for the new policy," and demonstrate that it is "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Gonzales-Veliz v. Barr*, 938 F.3d 219, 234 (5th Cir. 2019) (internal quotation marks omitted).

Here, the Commission does not come close to acknowledging a change in policy, let alone provide an explanation for that change. It mainly argues that the SFV and no-$0.000 minimum-rate requirements reflect "longstanding Commission policy." R.14, at 27-28, ¶ 47. But the Commission's prior actions cut through that revisionist history—as even the Commission elsewhere all but concedes. *See* R.14, at 32-33, ¶ 55 (admitting that "Commission's precedent" is "not entirely consistent"). That dooms the Commission's sudden shift in this case, for "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing

position. An agency may not *** depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The Commission likewise pays no heed to the considerable reliance interests it has engendered. Like the other intrastate pipelines that currently have Section (b)(1) rates on file with the Commission, Matterhorn expended the resources to secure approval of its intrastate rate from the Railroad Commission of Texas, obtained financing for a multi-billion-dollar pipeline, and structured its interstate contracts with natural gas shippers—all on the understanding that the Commission would continue to accept non-SFV and $0.000 minimum rates for comparable service. *See* R.7, at 10-14; R.9, at 4-5, 32. The Commission may not apply new rules in an individual pipeline adjudication where the pipeline has "incur[red] substantial unrecoverable costs in reliance on past Commission decisions." *United Gas Pipe Line Co. v. FERC*, 597 F.2d 581, 588 (5th Cir. 1979).

Indeed, Matterhorn met with Commission staff before electing its Section (b)(1) rates. Even though Commission staff raised various concerns with Matterhorn's draft statement of operating conditions—all

of which Matterhorn addressed prior to filing—there was no mention of SFV or minimum-rate requirements. Had the Commission staff raised those points before Matterhorn filed its section 311 rates, it still would not have been lawful to pressure Matterhorn to abandon its Section (b)(1) election without formally amending the regulation through notice-and-comment rulemaking. But at a minimum, Matterhorn could have considered making different arguments (under protest) or pursued another regulatory pathway altogether. *See, e.g.*, R.14, at 26-28, ¶¶ 46-47 (dismissing Matterhorn's concerns because "it is incumbent upon the applicant to select the appropriate framework upon which to support its rates"); *see also* 18 C.F.R. § 284.123(g) (providing for "[n]otice [p]rocedures").

Instead, the Commission pulled the rug out from under Matterhorn in a variety of ways. By the time Matterhorn had notice in the Initial Order that it should have affirmatively requested an exception to using SFV based upon evidence that the Commission apparently now demands (*e.g.*, "unusual competitive circumstances"), *see* R.6, at 6-7, ¶¶ 10-11, Matterhorn had already contracted its entire system under firm agreements that contemplated identical intrastate and section 311 rates.

Shippers filed no protests or complaints before either the Railroad Commission of Texas or the Commission, resulting in no arguments for Matterhorn to address with additional evidence *before* the Initial Order issued. Nor should Matterhorn have been expected to do so in a rehearing petition, subject to strict limitations regarding presentation of new material. *See* R.14, at 18, ¶ 32 (rejecting Matterhorn's arguments on rehearing); *see also NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 116-117 (D.C. Cir. 2017) ("Parties seeking rehearing of Commission orders are not permitted to include additional evidence in support of their position *** . PJM's stakeholders therefore could not fully contest [the Commission's] modifications with new evidence on rehearing.").

On a broader level, the Commission's policy pronouncements in the Orders will have the effect of upending settled industry expectations and practices. Pipelines with rates similar to Matterhorn's now face a host of new questions about the status of those rates, the economics of their operations, and whether the Commission will call on them to defend or amend their filings. Likewise, pipelines that have already engaged state agencies to approve non-SFV intrastate rates are now left to wonder whether they will be able to use those rates for interstate service under

Section (b)(1) or be forced to justify them from scratch in a Section (b)(2) proceeding. The APA requires the Commission to address those and other issues head on. *See Encino Motorcars*, 579 U.S. at 224 ("In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision.").

### B. The Commission Cannot Apply Its New Rules To Matterhorn Retroactively And Without Notice

The Commission's application of new rules in Matterhorn's rate proceeding also flouts restrictions on retroactivity and notice. "[A]n administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." *Heckler v. Community Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 n.12 (1984). An agency must also ensure that parties to an adjudication "will be accorded a full opportunity to be heard before" the agency applies a new policy. *Lion Elastomers, LLC v. NLRB*, 108 F.4th 252, 262 (5th Cir. 2024) (internal quotation marks omitted).

Here, the Commission failed on both fronts. As discussed, the Commission has effectively created an entirely new set of rules that will govern Matterhorn's and other intrastate pipelines' Section (b)(1)

elections after the fact. That is problematic for Matterhorn, to say the least, and deeply unsettling for industry stakeholders generally.

In addition, the Commission deprived Matterhorn of any opportunity to be heard. Contrary to the Commission's claim, it lacks unfettered authority to "apply new policies for the first time to *** parties involved in [an] adjudication." R.14, at 35, ¶ 60. Even assuming the Commission could alter Section (b)(1)'s scope through adjudication, *contra Mortgage Bankers*, 575 U.S. at 101, "[t]he bottom line is that the [Commission's] ability to change policies via adjudication is premised on the assumption that the parties to that adjudication will be 'accorded a full opportunity to be heard before the [Commission] makes its determination,'" *Lion Elastomers*, 108 F.4th at 262 (quoting *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 295 (1974)).

Here, given the Commission's prior and consistent treatment of intrastate pipelines, inability to alter its regulation without undertaking notice-and-comment rulemaking, and explicit statements about Section (b)(1)'s operation, Matterhorn "had no reason to anticipate that" it would be required to use SFV or set non-$0.000 minimum rates. *Lion Elastomers*, 108 F.4th at 260. Matterhorn, "therefore, could not have

foreseen the need to argue" against those rules when making its Section (b)(1) rate election. *Id.* at 261. It follows that the Commission's rejection of Matterhorn's Texas-approved rates, including for purported failure to present certain arguments and evidence responsive to the Commission's then-unarticulated rubric, "deprived [Matterhorn] of a pre-decision opportunity to be heard." *Id.*

## CONCLUSION

For the foregoing reasons, this Court should grant the petitions for review, vacate the Commission's Orders, and remand for the Commission to accept the Texas-approved rates elected in Matterhorn's October 31, 2024 statement of operating conditions and petition to establish rates, pursuant to 18 C.F.R. § 284.123(b)(1)(ii).

April 13, 2026

Respectfully submitted,

*/s/ Z.W. Julius Chen*
Z.W. Julius Chen
Emily P. Mallen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
chenj@akingump.com

*Counsel for Petitioner Matterhorn Express Pipeline, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2026, I electronically filed the foregoing with the Clerk of the Court of the U.S. Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Z.W. Julius Chen*
Z.W. Julius Chen

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,452 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Century Schoolbook font.

*/s/ Z.W. Julius Chen*
Z.W. Julius Chen

April 13, 2026